**Timothy Brian WILKER, Appellee,**

v.

**Paula Ann WILKER, Appellant.**

No. 00–1384.

Supreme Court of Iowa.

July 5, 2001.

Francesca Passeri, Tipton, for appellant.

Lawrence L. Lynch of Lynch, Greenleaf & Michael, L.L.P., Iowa City, for appellee.

SNELL, Justice.

The central concern in this case is physical custody of a child. The issues that stem from that concern are related to due process, a domestic abuse determination under the theory of aiding and abetting, and the admission of two alleged hearsay letters into evidence. Because we agree the best interest of the child can best be met by the husband, we affirm.

## I. Factual Background and Procedure

Timothy and Paula Wilker did not have a happy marriage. The turmoil escalated to the point where Timothy asked Paula for a divorce. Paula went to stay with her brother and sister-in-law, Bill and Angie Thumann, for a few days to consider this request. This was a difficult decision for both Wilkers because they had an eight-year-old son, Stephen. Paula left Stephen behind with Timothy during this time.

Paula returned home on a Sunday evening accompanied by Bill, Angie, and their four-year-old child. The following facts are in dispute. Paula claims that she and Angie went inside, while Bill and the child waited in the car outside. Paula told Timothy she would give him a divorce, but only if he let her take Stephen. Paula alleges that Timothy became belligerent and hostile.

During this verbal altercation, Paula claims Angie called Bill into the house "to talk to Tim." Timothy attempted to call the police, but Angie grabbed the phone to place the call herself, and it became disconnected. Angie sought to take Stephen outside, which Timothy tried to prevent. Bill held Timothy "in a bear hug" to allow Angie and Stephen to exit. Timothy tried to break free and several pieces of furniture were broken in this struggle. Timothy finally got loose and immediately ran to call the police.

Timothy tells a different version of events. Timothy claims that when Paula said she was taking Stephen, he wanted to call police to see what his rights were. Paula stood by while Angie pushed Timothy down on the couch to prevent his call. Paula then let Bill into the house. Timothy got up to attempt to make his call when Bill grabbed him and caused Timothy to fall on a chair, which broke from his fall. Bill then pushed Timothy up against the counter in the kitchen, and Angie pulled the telephone cord out of the wall. Paula did nothing to prevent this situation. Stephen was taken outside and locked in Bill's truck. Timothy broke free to call the police from his bedroom. Stephen was very upset and crying. Timothy's attempts to talk to Stephen were thwarted by Paula.

There is no dispute that when police arrived, Bill and Angie were combative and refused to make complete statements. This is corroborated by police. After the police left, Timothy drove himself to the hospital to be treated for his bruises, scrapes, and chest injuries suffered from his contact with Bill Thumann. Timothy then went to the police station to press charges against Bill for assault causing injury and Angie for obstructing emergency communications. He made no criminal allegation against Paula.

Several days later, Timothy decided to file a civil petition against Paula for relief from domestic abuse. He sought a perma-

nent protective order against her and physical custody of their son, Stephen. Following the scuffle, Paula had taken Stephen and refused to return him. Stephen was returned to Timothy when a temporary protective order was entered against Paula.

In addition to Paula's part in standing by and letting Bill and Angie assault him, Timothy argued he should have physical custody of Stephen for several reasons: (1) Timothy takes an active role in Stephen's life by coaching his sports teams and participating in Cub Scouts with him; (2) Paula does not have a driver's license, and Timothy has always been responsible for Stephen's transportation needs; (3) Stephen needs medical attention for a potentially serious testicular abnormality which Paula could not provide to him without a driver's license; (4) Paula suffers from depression and is disinclined to follow treatment orders given to her; and (5) Paula is living in Cedar Rapids with Bill and Angie where Stephen would have to attend a new school and make new friends.

Although Timothy's petition alleged domestic abuse, it did not indicate Timothy would be asserting an aiding and abetting theory at trial. The trial court allowed Timothy to allege this theory. The trial court also allowed Timothy to admit two alleged hearsay letters into evidence subject to the objection of Paula. The trial court did not state that it relied on any information in these letters to make its ruling. Rather, the court based its decision on Stephen's medical needs, Paula's inability to drive him to appointments, Paula's participation with Angie and Bill "in what [it] believ[ed] to be an assault," Paula's living arrangements with people who had physically assaulted Timothy, Paula's continued ability to harm Timothy by getting the aid of her family, and Stephen's overall best interest.

As such, the trial court granted physical custody of Stephen to Timothy. It entered a permanent protective order against Paula and her family. Timothy was also allowed to keep the family home for him and Stephen to reside in. Paula was granted visitation of every weekend, Friday 6:00 p.m. to Saturday 6:00 p.m., to occur at a neutral, drop-off site.

Paula appeals the district court's decision alleging: (1) Her due process rights were violated by allowing Timothy to assert an aiding and abetting theory at trial although his petition did not specify this theory; (2) The trial court erred in finding she committed domestic abuse under this theory; (3) The trial court erred in admitting hearsay evidence; and (4) The trial court erred in providing physical custody of Stephen to Timothy.

## II. Scope and Standard of Review

"Because child custody and support are matters triable in equity, our review is de novo." *In re Marriage of Fox*, 559 N.W.2d 26, 28 (Iowa 1997); Iowa R.App.P. 4. Civil domestic abuse cases are also heard in equity and, thus, deserve a de novo review. *Knight v. Knight*, 525 N.W.2d 841, 843 (Iowa 1994). Moreover, the same is true when fundamental constitutional rights are raised. *Id.* As such, we are able to consult the record in its entirety and formulate our own opinion. *In re Marriage of Beecher*, 582 N.W.2d 510, 512–13 (Iowa 1998) ("We examine the entire record and adjudicate anew rights on the issues properly presented."). Respectful consideration is given to the trial court's factual findings and credibility determinations, but not to the extent where those holdings are binding upon us. Iowa R.App.P. 14(f)(7); *accord In re Marriage of Knickerbocker*, 601 N.W.2d 48, 51 (Iowa 1999).

### III.  Issues on Appeal

#### A.  Notice

■ Paula alleges that by asserting an aiding and abetting theory of assault, she had no notice of the charges against her to bring a proper defense for the claim of domestic abuse. We find no merit to this contention. Paula knew that Timothy was alleging she committed domestic abuse against him. She also knew what event caused him to file the suit. Whether he was charging her as the principal or as an aider and abettor of the assault, she knew the conduct she needed to be prepared to refute.

In Iowa, very little is required by way of pleading to provide notice. Iowa R.Civ.P. 69; *accord Rieff v. Evans*, 630 N.W.2d 278 (Iowa 2001). Civil domestic abuse suits must follow specific statutory procedures, which are prescribed in Iowa Code chapter 236 (1999). Here, the petition was filed on the required domestic abuse form, and Paula was the named defendant. *See* Iowa Code §§ 236.3, .3A. The affidavit attached to the form described the incident, but did not link the physical violence specifically to one person. Rather, the affidavit said Paula, Bill, and Angie physically assaulted Timothy and forcefully removed Stephen. From this language, it is clear that Timothy intended to treat Paula as a principal. Under our aiding and abetting statute, Paula is just as guilty as the assaulters if she was acting in concert with them. *Id.* § 703.1. It is not unreasonable to assume then that the same evidence would be presented by Timothy to support his claim that he was assaulted by Paula as a principal or as an aider an abettor.

■ However, we must recognize that sufficient notice under Iowa Rule of Civil Procedure 69 may not always amount to constitutional due process when significant fundamental interests are at stake. Paula argues that even if she had sufficient notice under Rule 69, because the issues of custody of her son and residence in the family home were involved, more process was due. She argues specifically that she did not receive constitutional notice and an opportunity to be heard because of the petition's shortcomings.

We must first note that no spouse suffers a "deprivation of a fundamental, constitutionally protected interest when ordered to 'cease domestic abuse' of [their spouse]." *Knight*, 525 N.W.2d at 844 (quoting Iowa Code § 236.5(2)(a)). And while it is certainly true that parental rights enjoy fundamental interest status, this is not a parental rights termination case "where due process requirements are more strict." *Id.; see also Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed.2d 645, 652 (1944) (determining that parental rights are a fundamental interest). Instead, we must evaluate this claim

> in the context of domestic abuse hearings, hearings that tend to be less than formal.
>
>     . . . .
>
> . . . Out of necessity domestic abuse procedures are routinely instigated upon a pro se petition and consequently, . . . some leeway must be accorded from precision draftsmanship.

*Knight*, 525 N.W.2d at 843. Paula argues that in *Knight*, custody and the presumption of awarding the family home to the victim of domestic abuse were not at issue and, therefore, less process was due to the defendant. She maintains that with these interests involved here, something more should have been afforded to her.

We do not require the theory of aiding and abetting to be pled even in a criminal case where the loss of many fundamental interests are at stake. Iowa Code § 703.1 (stating that an aider and abettor is

charged as a principal); *State v. Black*, 282 N.W.2d 733, 735 (Iowa 1979) ("[W]e hold there was no fatal variance between the information charging the defendant as a principal and the proof that he was an aider and abettor to the robber who held the gun."). We have specifically found: "To have charged defendant as an aider and abettor in the county attorney's information would have been surplusage." *State v. Rydel*, 262 N.W.2d 598, 601 (Iowa 1978).

■ Any adjudication of domestic abuse may have a potentially negative effect on past, present, or future custody or visitation disputes. Iowa Code § 236.5(2)(d). The fact that such disputes were not involved in *Knight* does not make the consequences of Knight's adjudication sufficiently less serious than Paula's so as to warrant greater due process in her case. Further, the domestic abuse chapter is meant to be "protective rather than punitive in nature ... [and is given] 'a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it.'" *Christenson v. Christenson*, 472 N.W.2d 279, 280 (Iowa 1991) (quoting *Shidler v. All Am. Life & Fin. Corp.*, 298 N.W.2d 318, 321 (Iowa 1980)).

In *Knight*, our court allowed the plaintiff's domestic abuse case to be based, in part, on conduct and events not stated in the pleading. *Knight*, 525 N.W.2d at 843–44. We held there was no due process violation. Similarly, in *Smith*, notice was not a fatal defect to a domestic abuse petition that did not specifically plead that an assault was committed. *Smith v. Smith*, 513 N.W.2d 728, 730–31 (Iowa 1994). Neither of these minor shortcomings are at issue in the present domestic abuse petition. Here, the event giving rise to the suit is adequately explained in the petition. There are also sufficient allega-

tions that Timothy was touched in a way he considered to be offensive.

As such, the present petition easily satisfied Rule 69. Further, Paula was present at the hearing, heard Timothy's testimony, and was able to refute it herself, as well as refute it by calling her sister-in-law, Angie, to testify. She was also represented by counsel. Accordingly, no due process rights were violated.

### B. Domestic Abuse by a Preponderance of the Evidence

■ Because this is a civil proceeding, Timothy needs to prove the occurrence of domestic abuse by a preponderance of the evidence. The two undisputed facts to support Timothy's allegation of assault are that Bill physically restrained Timothy against his will, and Timothy suffered some minor injuries. In order to prove domestic abuse, sufficient facts of assault must be alleged. The definition of assault is useful to this discussion.

A person commits an assault when, without justification, the person does ...

Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.

Iowa Code § 708.1(1).

It is clear that by Bill putting Timothy in a "bear hug," he committed an assault on Timothy. Such conduct was committed in Timothy's home and was unwelcome. The greater weight of the testimony shows that Bill restrained Timothy because he wanted to get Stephen out of the house, not because he was afraid Timothy was a threat. Timothy also testified that Angie physically pushed him down—an act that would be offensive to Timothy. Given these factual findings, and placing considerable weight on the district court's credi-

bility determinations, there is sufficient evidence to establish by a preponderance of the evidence that an assault occurred.

■■■■ The key question then is Paula's involvement in the assault to make her culpable. We have said a person who aids and abets an assault is guilty "whether they directly commit the act constituting the offense." *Id.* § 703.1.

> To convict one of a crime on the theory of aiding and abetting, the State must produce substantial evidence that the accused
>
>> assented to or lent countenance and approval to the criminal act either by active participation in it or by some manner encouraging it prior to or at the time of its commission.
>
> It is true the State must prove the accused knew of the crime at or before its commission. But such proof need not be—and frequently cannot be—established by direct proof. The proof may be either direct or circumstantial.
>
> Although such knowledge is essential, neither knowledge nor proximity to the scene is—standing alone—enough to prove aiding and abetting. But—as the State points out—such factors in combination with circumstantial evidence such as "presence, companionship, and conduct before and after the offense is committed" may be enough from which to infer a defendant's participation in the crime.

*State v. Lewis,* 514 N.W.2d 63, 66 (Iowa 1994) (citations omitted) (quoting *State v. Lott,* 255 N.W.2d 105, 107 (Iowa 1977); *State v. Miles,* 346 N.W.2d 517, 520 (Iowa 1984)).

■■■■ Here, Paula admitted that she brought Bill and Angie along as "insurance" to be able to take Stephen with her. She knew Timothy would oppose such an action should she attempt to take Stephen

away by herself. We are persuaded that she called Bill into the house to restrain Timothy when she discovered Timothy would not let her take Stephen. She stood by while Angie shoved Timothy and while Bill struggled with Timothy. She never tried to stop Bill or Angie from touching Timothy. There was also undisputed testimony that this is not the first time Paula has used Bill to assault Timothy. Paula called on Bill to "rough up" Timothy in 1994, which resulted in Bill ripping off Timothy's shirt and throwing him down on the ground. When the incident at issue here concluded, Paula left with Bill and Angie and returned to their home, taking Stephen with her. No one told police that Timothy had done anything to instigate the physical contact, that his hostility forced them to restrain him and get Stephen outside, or that anyone feared Timothy. Bill and Angie were combative to police questions, and neither they nor Paula would give police a meaningful statement of events.

Although Paula attempts to downplay the event as an inconsequential incident, Timothy was clearly assaulted. We are persuaded that Paula lent countenance to this assault. *See State v. Kneedy,* 232 Iowa 21, 28, 3 N.W.2d 611, 615 (1942) ("Participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed."). As such, we agree that the issue of domestic abuse was proven by a preponderance of the evidence.

### C. Admission of Hearsay Subject to Objections

■■■■ As this was a trial in equity, the court did not need to rule on objections, but could hear all evidence subject to objections. *Howard v. Schildberg Constr. Co.,* 528 N.W.2d 550, 552 (Iowa 1995). The trial court listed the reasons it felt custody

should be with Timothy, none of which included any information found within the two alleged hearsay letters. Because we do not find that the district court relied on any information contained in these letters, and because we likewise choose not to incorporate this information into our determination, we need not pass judgment on their admissibility. "The question of admissibility is not controlling ... [if] we arrive at the same result on the merits of the appeal with or without that evidence, under our de novo review." *Stookey v. Stookey*, 229 N.W.2d 256, 257–58 (Iowa 1975).

### D. Physical Custody Finding

The controlling concern in custody disputes is the best interest of the child. When domestic abuse is involved, safety is also a key consideration. We consider the following factors to determine who should rightfully have physical custody of Stephen: (1) Paula has no driver's license; (2) Stephen has a potentially dangerous ailment for which he needs medical care; (3) Paula admitted she had no idea that Stephen has a serious medical condition; (4) Paula may suffer from depression, which she does not treat; (5) Timothy is living in the family home near Stephen's school and friends; (6) Stephen and Timothy share many common interests and participate in sports and Cub Scouts together; (7) Paula committed domestic abuse against Timothy; (8) Paula is living with people who have assaulted Timothy; (9) Timothy testified he had been assaulted by Bill once before at the direction of Paula; (10) Timothy works in the evening; (11) Both testified that they were the primary caregiver; (12) Timothy testified that he is responsible for helping Stephen with his education; (13) Timothy testified that Paula and Stephen's relationship was unstable and unsupportive; and (14) Paula and An-

gie testified that Timothy tended to drink a lot, but Timothy denied this allegation.

It is persuasive that at the conclusion of testimony, the district court found Timothy's testimony more credible and settled the dispute of facts in his favor. We feel there is sufficient evidence to support the district court's grant of physical custody to Timothy. Clearly, there are some positives and negatives for physical custody in both Timothy and Paula. Giving weight to the district court's witness credibility determination and factual findings, our court reaches the same conclusion as the district court. Our review of the record indicates Timothy is in the best position to provide for the current and long-term care of Stephen in the safest environment. The best interest of Stephen is properly served by keeping him in a place of normalcy and stability during this volatile time. As such, we uphold the grant of physical custody in Timothy for the duration of the protective order.

**AFFIRMED.**